_____

**No. 23-11222**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

GSR MARKETS LIMITED,

*Appellant,*

v.

WELLS FARGO BANK, N.A., *et al.*,

*Appellees.*

---

## ON APPEAL FROM
## THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
## No. 1:19-CV-1005-MLB

---

## APPELLEE WELLS FARGO BANK, N.A.'S BRIEF

---

Brent D. Hitson
Tala Amirfazli
BURR & FORMAN LLP
171 Seventeenth Street, N.W.
Suite 1100
Atlanta, Georgia 30363
Telephone: (404) 815-3000

*Counsel for Appellee Wells Fargo Bank, N.A.*

No. 23-11222

*GSR Markets Limited v. Wells Fargo Bank, N.A., et al.*

## APPELLEE WELLS FARGO BANK, N.A.'S CERTIFICATE OF INTERESTED PERSONS

Pursuant to F.R.A.P. 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the undersigned counsel for Appellee Wells Fargo Bank, N.A. ("Wells Fargo") hereby certify that the following is a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporations that own 10% or more of the party's stock, and other identifiable legal entitles related to a party:

1.  Alivic Corporation Pty, Ltd.

2.  Amirfazli, Tala (counsel for Defendant/Appellee Wells Fargo).

3.  Austin, Brandon (party defendant).

4.  Austin, Hugh (party defendant).

5.  Brown, Honorable Michael L. (Judge, United States District Court for the Northern District of Georgia).

No. 23-11222

*GSR Markets Limited v. Wells Fargo Bank, N.A., et al.*

6.    Burr & Forman LLP (counsel for Defendant/Appellee Wells Fargo).

7.    Gage, Rachel F. (counsel for Plaintiff/Appellant GSR Markets Limited).

8.    GSR Markets Limited (Plaintiff/Appellant), which, upon information and belief and based on the information disclosed in its Certificate of Interested Persons, (Dkt. 5), is owned by Yellow Capital Fund I, which is an exempt company incorporated in the Cayman Islands with limited liability.

9.    Hitson, Brent D. (counsel for Defendant/Appellee Wells Fargo).

10.    McDonald, Diana (party defendant).

11.    McDonald Law Group, LLC (party defendant).

12.    OTC Desks, Ltd., LLC.

13.    Robbins, Richard L. (counsel for Plaintiff/Appellant GSR Markets Limited).

No. 23-11222

*GSR Markets Limited v. Wells Fargo Bank, N.A., et al.*

14.    Robbins Alloy Belinfantel Littlefield LLC (counsel for Plaintiff/Appellant GSR Markets Limited).

15.    Russo, Vincent R. (counsel for Plaintiff/Appellant GSR Markets Limited).

16.    Valkyrie Group, LLC (party defendant).

17.    Wells Fargo Bank, N.A. (Defendant/Appellee), which is a wholly-owned subsidiary of WFC Holdings Corporation, which is a wholly-owned subsidiary of Wells Fargo & Company, and of these companies only Wells Fargo & Company is publicly traded (publicly traded on NYSE as WFC).

18.    Yavorsky, Austin.

No. 23-11222

*GSR Markets Limited v. Wells Fargo Bank, N.A., et al.*

## CORPORATE DISCLOSURE STATEMENT

To Appellees' knowledge, there are no other entities whose publicly-traded stock, equity, or debt may be substantially affected by the outcome of this Appeal.

*s/ Brent D. Hitson*
Brent D. Hitson
Georgia Bar No. 358025
bhitson@burr.com
Tala Amirfazli
Georgia Bar No. 523890
tamirfazli@burr.com
*Counsel for Appellee Wells Fargo
Bank, N.A.*

**BURR & FORMAN LLP**
171 Seventeenth Street, N.W.
Suite 1100
Atlanta, Georgia 30363
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

## STATEMENT REGARDING ORAL ARGUMENT

Wells Fargo respectfully requests oral argument in this case, as Wells Fargo believes that oral argument will significantly aid the Court in rendering its opinion. *See* Fed. R. App. P. 34(a)(2)(C); 11th Cir. R. 34-3(b)(3). Wells Fargo is aware that Appellant GSR Markets Limited ("GSR") also requests oral argument; however, GSR's Statement Regarding Oral Argument contains unsupported and conclusory allegations relating to issues of knowledge and the legal duty imposed on financial institutions with regard to non-customers. (*See* Appellant's Br., Dkt. 19 at 4.)[1] In its Statement Regarding Oral Argument, GSR asserts that the United States Court of Appeals for the Eleventh Circuit and courts within the Middle District of Georgia have recognized a duty that financial institutions owe to noncustomers. (*See id.*) As discussed in detail in this Brief, the case law cited by GSR is easily distinguishable from this matter, and the District Court's holding in this case is not

---

[1] References to the record below herein are consistent with the docket and page numbers generated by the District Court's electronic filing system, (ECF No. __). References to pleadings filed in the Eleventh Circuit will be referenced as Dkt. __, as well as the page number generated by the Eleventh Circuit's electronic filing system. (*See* 11th Cir. Local Rule 28-5.)

i

contrary to Georgia law, the precedent of this Court, or prior decisions by federal courts within the Middle District of Georgia.

# TABLE OF CONTENTS

APPELLEE WELLS FARGO BANK, N.A.'S CERTIFICATE OF
    INTERESTED PERSONS ........................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS .................................................................. iii

TABLE OF CITATIONS .................................................................. v

I.    STATEMENT OF SUBJECT-MATTER AND APPELLATE
    JURISDICTION ................................................................. 1

II.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..... 3

III.    STATEMENT OF THE CASE ........................................... 5

    A.    Summary and Nature of the Case ......................................... 5

    B.    Procedural History ................................................. 7

    C.    Statement of the Facts ........................................... 13

        1.    Diana McDonald, Her Law Firms, and Her
        Banking Relationship with Wells Fargo. ................... 13

        2.    GSR and Its Experience with Bitcoin Transactions.... 13

        3.    Timeline of Events of the Subject Proposed Bitcoin
        Transaction. ................................................. 15

        4.    GSR's Limited Due Diligence for the Proposed
        Transaction. ................................................. 26

        5.    Wells Fargo Addressed the Prior "Complaints"
        Regarding the IOLTA Account. ................................. 28

    D.    Statement of the Standard or Scope of Review ................... 30

IV.    SUMMARY OF THE ARGUMENT ............................................... 31

V.    ARGUMENT ..................................................................... 35

    A.    The District Court Properly Granted Summary Judgment on GSR's Negligence Claim Because Wells Fargo Does Not Owe a Duty of Care to GSR. ........................ 35

    B.    The District Court Properly Granted Wells Fargo Summary Judgment on GSR's Derivative Claims for Punitive Damages and Attorneys' Fees. ............................... 41

    C.    The District Court erred because GSR's Claims are Preempted by the Article 4A of the UCC. ........................... 41

    D.    The District Court erred in holding that Wells Fargo is not Statutorily Immune from Liability for the Alleged Misuse of Funds by McDonald. ............................. 46

    E.    The District Court erred in holding that Wells Fargo is not Statutorily Immune from Liability for its Response to the Adverse Claim Asserted by GSR. .............................. 50

VI.    CONCLUSION .................................................................. 54

CERTIFICATE OF COMPLIANCE ..................................................... 56

CERTIFICATE OF SERVICE ......................................................... 57

# TABLE OF CITATIONS

<u>Cases</u>:                                                                            <u>Page(s)</u>

*Atlanta Sand & Supply Co. v. Citizens Bank,*
    622 S.E.2d 484 (Ga. Ct. App. 2005) ...................................38, 47, 49

*Bank South v. Grand Lodge of Free & Accepted Masons for Ga.,*
    331 S.E.2d 629 (Ga. Ct. App. 1985) ...............................................47

*Big Bend Agri-Servs., Inc. v. Bank of Meigs,*
    330 S.E.2d 422 (1985)......................................................................35

*Burrell v. Warden I,*
    857 F. App'x 624 (11th Cir. 2021) ..................................................12

*Chen Jun v. Regions Bank,*
    No. 1:19-cv-01524, 2020 WL 5603527
    (N.D. Ala. Sept. 18, 2020)...............................................................36

*Citizens Bank of Forsyth v. Middlebrooks,*
    72 S.E.2d 298 (Ga. 1952).........................................................38, 39

*Dalton Point, L.P. v. Regions Bank, Inc.,*
    651 S.E.2d 549 (Ga. Ct. App. 2007) ........................................38, 39

*Dean v. Nationsbank,*
    486 S.E.2d 647 (Ga. Ct. App. 1997) ...............................................53

*Ellis v. England,*
    432 F.3d 1321 (11th Cir. 2005) .......................................................30

*Est. of Bass v. Regions Bank, Inc.,*
    947 F.3d 1352 (11th Cir. 2020) .......................................................42

*First Am. Title Ins. Co. v. Eddings,*
    No. 4:12-cv-10, 2014 WL 106691
    (M.D. Ga. Jan. 9, 2014) .............................................37, 38, 39, 48

*First Ga. Bank v. Webster,*
    308 S.E.2d 579 (Ga. Ct. App. 1983) ...............................................42

Cases:                                                                    Page(s)

*First Union Bank of Ga. v. Daniel,*
     368 S.E.2d 768 (Ga. Ct. App. 1988) ................................................35

*Focus Ent. Int'l, Inc. v. Wachovia Bank, N.A.,*
     No. 1:04-cv-2649, 2005 WL 8155037
     (N.D. Ga. Nov. 18, 2005) ........................................................47, 49

*Ga. CVS Pharm., LLC v. Carmichael,*
     890 S.E.2d 209 (Ga. 2023) ..................................................39, 40, 41

*Grogan v. Lanier Bank & Tr. Co.,*
     464 S.E.2d 892 (Ga. Ct. App. 1995) ................................................48

*Houston v. Bedgood,*
     588 S.E.2d 437 (Ga. Ct. App. 2003) ................................................35

*In re Equifax Fair Credit Reporting Act Litig.,*
     No. 1:22-cv-03072, 2023 WL 6192732
     (N.D. Ga. Sept. 11, 2023) ...............................................................40

*Kalpakchian v. Bank of Am. Corp.,*
     No. 1:18-cv-03235, 2019 WL 12426033
     (N.D. Ga. Oct. 4, 2019),
     *aff'd,* 832 F. App'x 579 (11th Cir. 2020).......................................35

*Midwest Feeders, Inc. v. Regions Bank (Inc.) (Ala.),*
     No. 1:15-CV-00013, 2016 WL 5796894,
     (M.D. Ga. Sept. 30, 2016),
     *aff'd,* 707 F. App'x 952 (11th Cir. 2018).......................................35

*Nat'l Nu Grape Co. v. Citizens & S. Nat'l Bank,*
     93 S.E.2d 381 (Ga. Ct. App. 1956) .................................................38

*Parm v. Nat'l Bank of Cal., N.A.,*
     242 F. Supp. 3d 1321 (N.D. Ga. 2017) ...........................................36

Cases:                                                                Page(s)

*Parrish v. Chase Bankcard Servs., Inc.*,
        No. 1:13-cv-01504, 2014 WL 12572735
        N.D. Ga. June 10, 2014), *R. & R. adopted*,
        2014 WL 12575839 (N.D. Ga. July 17, 2014) ...............................35

*Peter E. Shapiro, P.A. v. Wells Fargo Bank, N.A.*,
        795 F. App'x 741 (11th Cir. 2019) ..................................................42

*Promissor, Inc. v. Branch Bank & Tr. Co.*,
        No. 1:08-cv-1704, 2008 WL 5549451
        (N.D. Ga. Oct. 31, 2008) ................................................................35

*Regions Bank v. Kaplan*,
        No. 17-15478, 2021 WL 4852268
        (11th Cir. Oct. 19, 2021)........................................................46, 49

*Regions Bank v. Provident Bank, Inc.*,
        345 F.3d 1267 (11th Cir. 2003) ...................................42, 43, 45, 49

*Sapuppo v. Allstate Floridian Ins. Co.*,
        739 F.3d 678 (11th Cir. 2014) ........................................................12

*Serv. Lines, Inc. v. Tr. Co. Bank*,
        377 S.E.2d 872 (Ga. Ct. App. 1989) ...............................................47

*Sullivan's Admin. Managers II, LLC v. Guarantee Ins. Co.*,
        No. CV 412-212, 2014 WL 12617453
        (S.D. Ga. Jan. 31, 2014) ................................................................36

*Tattnall Bank v. Harvey*,
        198 S.E. 724 (Ga. 1938)...............................................38, 39, 46, 47

*Tr. Co. Bank of Augusta N.A. v. Henderson*,
        364 S.E.2d 289 (Ga. Ct. App. 1987),
        *aff'd*, 373 S.E.2d 738 (Ga. 1988).....................................................48

*Zeal Global Servs., Private Ltd. v. SunTrust Bank*,
        508 F. Supp. 3d 1303 (N.D. Ga. 2020) ..................35, 42, 43, 45, 49

Statutes:                                                         Page(s)

28 U.S.C. § 1291 ................................................................ 2

28 U.S.C. § 1331 ................................................................ 1

28 U.S.C. § 1332 ................................................................ 1

O.C.G.A. § 7-1-352................................... 33, 37, 38, 47, 48, 49

O.C.G.A. § 7-1-353................................... 33, 49, 50, 52, 53, 54


Rules:

Fed. R. App. P. 34(a)(2)(C) ................................................ i

11th Cir. R. 34-3(b)(3) ...................................................... i

## I.   STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

GSR initiated this action in the District Court, asserting various state and federal claims against Defendants (i) Diana McDonald ("McDonald") and the McDonald Law Group LLP d/b/a Law Office of Diana McDonald, LLC (collectively, the "McDonald Defendants"), (ii) Valkyrie Group, LLC ("Valkyrie"), Hugh Austin and Brandon Austin (collectively, the "Valkyrie Defendants"), and (iii) Wells Fargo all arising out of GSR's participation in a proposed Bitcoin transaction. (ECF No. 1.) GSR is completely diverse in citizenship from each of the Defendants, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs. (*See id.*) The District Court therefore had subject-matter jurisdiction under 28 U.S.C. § 1332. Because GSR also asserted claims arising under federal law, (*see* ECF No. 1), the District Court also had subject-matter jurisdiction under 28 U.S.C. § 1331.

On March 22, 2022, the District Court granted summary judgment in favor of Wells Fargo on all of GSR's claims against Wells Fargo. (ECF No. 250.) Thereafter, On May 26, 2022, GSR and the McDonald Defendants filed that certain Stipulation of Dismissal Without Prejudice, which the District Court approved, and dismissed the McDonald

1

Defendants from the action. (ECF Nos. 261-63.) After granting, in part, GSR's Motion for Default Judgment against the Valkyrie Defendants, the District Court entered final judgment in Wells Fargo's favor. (ECF Nos. 264-65, 268-70, 272.) GSR timely filed a Notice of Appeal on April 14, 2023. (ECF No. 274.) Therefore, this Court has jurisdiction under 28 U.S.C. § 1291.

## II.    <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

1.    Whether the District Court properly granted summary judgment in Wells Fargo's favor on GSR's negligence claim based on the finding that Wells Fargo does not owe GSR a common law duty when GSR was not a customer of Wells Fargo and did not otherwise have a direct relationship with Wells Fargo. (*See* ECF No. 250 at 43-49.)

2.    Whether the District Court properly granted summary judgment in Wells Fargo's favor on GSR's derivative claim for punitive damages and attorneys' fees based on the finding that all of GSR's substantive claims fail as a matter of law. (*See id.* at 54-55.)

3.    Whether the District Court erred in holding that Article 4A of the UCC does not preempt GSR's claims, based on its finding that there is a dispute of material fact as to whether Wells Fargo knew or should have known, by January 7, 2019, that attorney Diana McDonald was using her IOLTA Account for fraudulent purposes. (*See id.* at 30-38.)

4.    Whether the District Court erred in holding that O.C.G.A. § 7-1-352 does not shield Wells Fargo from liability for the actions or inactions of its customer who is an agent or fiduciary based on its finding

3

that there is a dispute of material fact as to whether Wells Fargo had knowledge Diana McDonald was acting dishonestly. (*See id.* at 38-41.)

5.      Whether the District Court erred in holding that O.C.G.A. § 7-1-353 does not shield Wells Fargo from liability in light of its finding that GSR did not satisfy the O.C.G.A. § 7-1-353(b) requirements. (*See id.* at 41-43.)

### III.  **STATEMENT OF THE CASE**

### A.    **Summary and Nature of the Case**

GSR—who has never been a customer of Wells Fargo—regularly engages in risky unregulated Bitcoin transactions as part of a business that it freely admits involves scams and less-than-professional brokers. (*See* ECF No. 221-1 at 34-37, 62-63, ECF No. 221-2 at 5, 84-85.) Here, GSR's claims come only after GSR voluntarily agreed to participate in a proposed Bitcoin transaction that, in the end, involved a scam and less-than-professional brokers. (*See* ECF No. 221-1 at 60-61; ECF No. 221-4 at 174.) After being introduced to an unfamiliar broker who "sounded a little bit like a con man" and an unfamiliar seller, and escrow agent (attorney and Defendant Diana McDonald), and after ignoring the numerous "red flags" that came up during its nearly non-existent due diligence review, GSR agreed to wire ***$4,000,000*** only ***two days*** later to Diana McDonald with whom it had never done business and with whom it had no written agreement of any kind regarding the funds. (*See* ECF No. 221-1 at 55, 57-58, 120, 143-47; ECF No. 226-1 at 250-63.)

After voluntarily sending its money to the previously unknown escrow agent, GSR discovered that it would not receive the Bitcoin it

expected. (*See* ECF No. 76 at 10, ¶ 27.) It was only ***after*** the scam had already happened with regard to the Bitcoin, that GSR decided to contact Wells Fargo to complain about Diana McDonald, a Wells Fargo customer. (*See* ECF No. 221-2 at 75-76; ECF No. 221-5 at 2.)

From Wells Fargo's standpoint, GSR was a complete stranger with no relationship whatsoever with Wells Fargo. (*See* ECF No. 223-1 at 215-27.) For all Wells Fargo knew at that time of the initial contact, GSR was itself attempting to perpetrate some sort of fraud or scam against the bank or one of its customers. (*See* ECF No. 221-2 at 24-26.) GSR acknowledges and admits that it would have been able to obtain a court order to freeze the disputed funds within a day or two after a lawsuit was filed, yet inexplicably waited ***two months*** after the purchased Bitcoin was supposed to be delivered to initiate this lawsuit and file a motion for temporary restraining order seeking to freeze the accounts at issue. (*See* ECF No. 1; ECF No. 221-1 at 140; ECF No. 221-2 at 94-95; ECF No. 226-1 at 244-45.) Shortly after commencing this action, the District Court granted GSR's motion for TRO and Wells Fargo immediately froze the accounts at issue. (*See* ECF No. 18.)

GSR now seeks to use Wells Fargo as its own personal insurer in an effort to recover funds it voluntarily sent to complete strangers. GSR finds itself in an unfortunate situation, but its claims against Wells Fargo are unfounded and directed at the wrong party. GSR made the intentional decision to limit its own due diligence review and engage in what it knew was a risky transaction. Any harm to GSR was a product of its own making and its decision to conduct business with those persons who committed the actual fraud.

## B.    Procedural History

GSR initiated this action on March 1, 2019, and thereafter filed its Verified Amended Complaint on April 17, 2019. (ECF Nos. 1, 76.) GSR asserts claims against Wells Fargo under Georgia law for (i) negligence, (ii) aiding and abetting fraud, breach of fiduciary duty and conversion, (iii) accounting and equitable and injunctive relief, (iv) punitive damages, and (v) attorneys' fees. (ECF No. 76.)

On July 9, 2021, Wells Fargo filed its Motion for Summary Judgment, seeking summary judgment in its favor on all claims asserted by GSR against Wells Fargo. (ECF No. 217.) In its brief in support of its Motion, Wells Fargo first argued that all of GSR's claims are preempted

by Article 4A of Georgia's UCC and that O.C.G.A. § 7-1-352 and § 7-1-353 provide statutory immunity to Wells Fargo from all of GSR's claims for liability, and then addressed the substantive nature of each claim, detailing why each of GSR's claims fail as a matter of law. (ECF No. 217-1 at 16-35.)

On March 22, 2022, the District Court entered its Opinion and Order granting Wells Fargo summary judgment on all of GSR's claims. (ECF No. 250.) Though the District Court disagreed with Wells Fargo's preliminary arguments of preemption and statutory immunity, it ultimately agreed with Wells Fargo's substantive arguments relating to each of GSR's claims. (*Id.*)

First, in granting Wells Fargo summary judgment on GSR's claim for negligence, the District Court properly held that because "GSR was not a [Wells Fargo] customer and did not otherwise have a direct relationship with [Wells Fargo]," Wells Fargo owed GSR no common law duty of care in the context of its negligence claim. (*Id.* at 43-46.) The District Court properly concluded that "[b]ecause there is no recognized duty of care, there can be no breach." (*Id.* at 45-46.)

Next, with respect to GSR's claim for aiding and abetting fraud (which the District Court interpreted as a claim for fraud based on GSR's allegations that Wells Fargo did not disclose certain information to GSR), the District Court properly held that because there is no authority to suggest Wells Fargo had a duty to disclose the disputed information to GSR, without this requisite duty of disclosure, there can be no claim for fraud. (*Id.* at 46-49.) GSR did ***not*** appeal the District Court's grant of summary judgment on its claim for aiding and abetting fraud. (Appellant's Br., Dkt. 19 at 13.)

Next, with respect to GSR's claim for aiding and abetting breach of fiduciary duty, the District Court properly held that because there is no evidence that Wells Fargo induced McDonald to breach her duties to GSR or to act improperly towards GSR in any way, there can be no claim for aiding and abetting breach of fiduciary duty. (ECF No. 250 at 49-51.) GSR did ***not*** appeal the District Court's grant of summary judgment on its claim for aiding and abetting breach of fiduciary duty. (Appellant's Br., Dkt. 19 at 13.)

Next, with respect to GSR's claim for aiding and abetting conversion (which the District Court interpreted as a claim for conversion

or claim that Wells Fargo procured McDonald to convert the Funds), the District Court properly held that because it is undisputed that Wells Fargo did not convert any of the Funds and because there is no evidence that Wells Fargo induced McDonald to convert the Funds, GSR's claim for aiding and abetting conversion fails as a matter of law. (ECF No. 250 at 51-53.) GSR did ***not*** appeal the District Court's grant of summary judgment on its claim for aiding and abetting conversion. (Appellant's Br., Dkt. 19 at 13.)

With respect to GSR's claim for accounting and equitable and injunctive relief, the District Court properly dismissed those claim following GSR's agreeing and acknowledging that those claims were moot. (ECF No. 250 at 30, n.7). GSR did ***not*** appeal the District Court's dismissal of its claim for accounting and equitable and injunctive relief. (Appellant's Br., Dkt. 19 at 13.)

And lastly, with respect to GSR's claims for attorneys' fees and punitive damages, the District Court properly concluded that because each of GSR's substantive claims failed, any claim for the recovery of attorneys' fees or punitive damages likewise fails. (ECF No. 250 at 54-55.) In granting summary judgment on GSR's claim for punitive

damages, the District Court also properly held that because there is no evidence to suggest that Wells Fargo's alleged actions were willful or consciously indifferent to the consequences, GSR's claim for punitive damages fails as a matter of law. (*Id.*)

Thereafter, on May 26, 2022, GSR and the McDonald Defendants filed that certain Stipulation of Dismissal Without Prejudice, and the District Court dismissed the McDonald Defendants from this action on May 31, 2022. (ECF Nos. 261-63.) On June 3, 2022, GSR filed a Motion for Default Judgment against the Valkyrie Defendants, which the District Court granted in part on October 21, 2022 and awarded GSR $1,562,762.24 in damages against the Valkyrie Defendants. (ECF Nos. 264, 268.) Despite being instructed to submit evidence in support of its claim for attorneys' fees and costs, (ECF No. 268 at 15), on November 4, 2022, GSR filed a Notice of Waiver of Claim for Attorneys' Fees and Request for Final Judgment. (ECF Nos. 269-70.) On March 28, 2023, the District Court entered its final Judgment in favor of GSR for its claims against the Valkyrie Defendants and in favor of Wells Fargo on all of GSR's claims against Wells Fargo. (ECF No. 272.)

GSR filed its Notice of Appeal on April 14, 2023, (ECF No. 274), and filed its Appellate Brief on August 10, 2023, (Appellant's Br., Dkt. 19). In its Appeal, GSR only seeks to appeal the District Court's holding as its claims against Wells Fargo for negligence, punitive damages and attorneys' fees. (*See* Appellant's Br., Dkt. 19 at 13.) As such, GSR did ***not*** appeal the District Court's ruling on GSR's claims against Wells Fargo for (i) aiding and abetting fraud, (ii) aiding and abetting breach of fiduciary duty, (iii) aiding and abetting conversion, and (iv) accounting and equitable and injunctive relief. (*Compare* ECF No. 250 at 46-53 *with* Appellant's Br., Dkt. 19 at 13.) Accordingly, GSR has waived these issues for purposes of this Appeal. *See e.g.*, *Burrell v. Warden I*, 857 F. App'x 624, 625 (11th Cir. 2021); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (collecting cases).

### C.    Statement of the Facts

### 1.    Diana McDonald, Her Law Firms, and Her Banking Relationship with Wells Fargo.

During the time period relevant to this matter, Wells Fargo customer Diana McDonald ("McDonald") had six business accounts for her two law firms, one of which was the subject IOLTA account ending in account number 4172 (the "IOLTA Account") and a second IOLTA account ending in 5641 (the "5641 Account"). (ECF No. 219-1 at 147, 152-56.)

### 2.    GSR and Its Experience with Bitcoin Transactions.

GSR describes itself as an "algorithmic trading company that specializes in digital assets," with more than half of its business being Bitcoin transactions. (ECF No. 221-1 at 34-37.) GSR acknowledges that transactions involving Bitcoin are "unregulated," and that there have been many "scams" perpetrated by "many different people in the [Bitcoin] space," but states "that is just the nature of the business." (*Id.* at 62, 72, 103, 136.)  Thus, prior to starting a relationship with a new person or company, GSR's typically performs a "due diligence" review as part of its "onboarding" process. (ECF No. 222-1 at 36-41, 50-54.)

13

GSR states that its "standard" "due diligence" and onboarding process consists of (i) validating "know your customer" ("KYC") information, which would be certain information needed to "properly identify anybody [GSR] transacts with," (ii) running anti-money laundering checks, and (iii) running a "background sanctions list check." (ECF No. 221-1 at 63-64; ECF No. 222-1 at 14, 36, 50-67, 70-71; ECF No. 225-1 at 54-55, 61.) Without the necessary KYC checks on a counterparty, GSR states that it cannot commit to a contract or transaction. (ECF No. 222-1 at 144-47; ECF No. 222-3 at 24-36.)

Additionally, there are certain things a Bitcoin buyer, like GSR, can do to ensure that the Bitcoin seller actually has Bitcoin to sell. (ECF No. 221-2 at 65-67; ECF 222-1 at 73-74; ECF No. 225-1 at 114-15.) Prior to starting a trading relationship, GSR usually completes a "test transaction" where the buyer of Bitcoin will purchase a relatively small amount of Bitcoin (100 Bitcoin) before agreeing to participate in the larger purchase (1,000 Bitcoin). (ECF No. 221-1 at 62-63, ECF No. 221-2 at 65-66.) Additionally, GSR usually requests "proof of keys," where GSR, as the buyer, will ask the seller to provide GSR with the seller's "Bitcoin wallet address" so that GSR could then go to a "block explorer," input

14

that certain "Bitcoin wallet address" and see how many Bitcoins are in that the seller's "wallet." (ECF No. 221-1 at 89-90; ECF No. 221-2 at 65-66.) Then, in order to confirm that the Bitcoin seller actually has control over that certain "wallet," and is not just giving GSR the "Bitcoin wallet address" of someone else with Bitcoin, GSR would ask that the Bitcoin seller transfer a small fraction of one Bitcoin (0.00347 Bitcoin or 0.00627 Bitcoin) somewhere else. (ECF No. 221-1 at 89; ECF No. 221-2 at 65-66; ECF No. 225-1 at 114-15.) ***It is undisputed that none of these things were done for the transaction at issue in this case***. (*See* ECF No. 221-1 at 62, 89-90; ECF No. 221-2 at 65-67; ECF No. 221-4 at 174, 179-80; ECF No. 222-1 at 101-03, 122-24, 173, 226.)

### 3.   Timeline of Events of the Subject Proposed Bitcoin Transaction.

On or about ***January 1, 2019***, Austin Yavorsky, a broker with OTC Desks, LLC ("OTC Desks"), contacted GSR's principal, Christian Gil about an opportunity for GSR to purchase a "large amount of Bitcoin" from Alivic Corporation Pty, Ltd. ("Alivic") (the "Proposed Transaction"). (ECF No. 76 at 7, ¶ 13; ECF No. 221-1 at 46, 48; ECF No. 225-1 at 30-31.) Thereafter, on or about January 1, Gil had a second call with Yavorsky, during which Yavorsky introduced Gil to Hugh Austin and

Brandon Austin and their company Valkyrie, and also to McDonald. (ECF No. 221-1 at 54-58.) Gil testified that during this call, the Austins made him "feel a bit strange" and that Hugh Austin "sounded a little bit like a con man." (*Id.* at 55, 57-58.) Despite these obvious red flags, GSR sent a letter of intent to OTC Desks, agreeing to purchase Bitcoin from Alivic (the "<u>Letter of Intent</u>"). (ECF No. 76 at 7, ¶ 16; ECF 76-1 at 2; ECF No. 221-1 at 60-61; ECF No. 221-4 at 174.)[2]

On ***<u>January 2, 2019</u>***, GSR had a series of calls with Hugh Austin, Yavorsky, and McDonald so that GSR could conduct at least some level of "due diligence" on McDonald. (ECF No. 221-1 at 90-91; ECF No. 221-4 at 180-81; ECF No. 225-1 at 76-78, 103-04.) Given GSR's stated view that banks can be "unfriendly" to Bitcoin transactions, GSR contemplated that McDonald may not have been forthcoming with Wells Fargo in using her Wells Fargo accounts in connection with Bitcoin transactions. (ECF No. 221-1 at 102-03; ECF No. 221-4 at 180-81.) GSR admits that it was discouraged from contacting Wells Fargo to inquire about Ms. McDonald

---

[2] The Letter of Intent contemplates that GSR would complete a 100 Bitcoin "test purchase," but ***GSR did not go through with the test purchase***. (ECF No. 76 at 7-8, ¶ 16; ECF 76-1 at 2; ECF No. 221-1 at 62; ECF No. 221-4 at 174.)

and any prior use of her Wells Fargo account(s) in connection with Bitcoin transactions. (ECF No. 221-1 at 90-92; ECF No. 221-4 at 180; ECF No. 225-1 at 98-99.)

On ***January 3, 2019***, GSR entered into that certain Private Deed of Agreement for Bitcoin Asset Exchange/Transaction (the "<u>Agreement</u>") which identified McDonald's IOLTA Account as the bank account to which GSR agreed to wire funds. (ECF No. 76 at 8, ¶ 17; ECF 76-2 at 2-19; ECF No. 221-1 at 95-96, 111; ECF No. 221-4 at 270-87.) Although GSR contends that it believed it would be purchasing Bitcoin from Alivic, neither Alivic nor its supposed principal Louie Sumich is identified as the "Seller" on the Agreement and neither is a signatory. (ECF No. 221-1 at 109-10, 129-30; ECF No. 221-4 at 270-87.) ***Wells Fargo is not a party to the Agreement***. (*See* ECF No. 221-4 at 270-87.)

With regard to McDonald's supposed services as an escrow agent for the contemplated Bitcoin transaction, GSR never entered into any written agreement with McDonald or her law firms in connection with the Proposed Transaction. (ECF No. 221-1 at 120-21, 123-24; ECF No. 222-1 at 193-94.)

That same day (January 3, 2019), GSR wired $4 million (the "Funds") to the IOLTA Account at Wells Fargo (the "GSR Wire") even though the actual transfer of the Bitcoin would not take place until GSR finalized negotiating the price. (ECF No. 76 at 10, ¶ 25; ECF No. 221-1 at 120, 125; ECF No. 221-4 at 270-87; ECF No. 225-1 at 119-20.) ***As of January 3, the IOLTA Account had an ending balance of $3,360,094.14***. (ECF No. 219-1 at 376-77.)[3]

On ***January 4, 2019***, GSR negotiated the purchase price for the 1,000 Bitcoin. (ECF No. 76 at 10, ¶ 26; ECF No. 221-1 at 120.) However, the purchased Bitcoin was not delivered to GSR as initially negotiated. (ECF No. 76 at 10, ¶ 27; ECF No. 221-1 at 132.) ***As of January 4, the IOLTA Account had an ending balance of $1,910,094.13***. (ECF No. 219-1 at 376-77.)[4]

By ***January 5, 2019***, there was a new understanding that the purchased Bitcoin would be delivered by 7:00 a.m. on January 7th, but

---

[3] On January 3, there was no activity involving the 5641 Account, with the Account having an ending balance of approximately $20.00. (ECF No. 219-1 at 476-77.)

[4] On January 4, there was no activity involving the 5641 Account, with the Account having an ending balance of approximately $20.00. (ECF No. 219-1 at 476-77.)

18

the Bitcoin was not then delivered to GSR. (ECF No. 221-1 at 132-33, 146-47; ECF No. 221-4 at 294-95.) ***On January 5 and January 6, there was no activity involving the IOLTA Account, with the Account having an ending balance of $1,910,094.13***. (ECF No. 219-1 at 376-77.)[5]

On ***January 7, 2019*** (sometime prior to 3:41 p.m.), Gil and attorney Aaron Krowne ("Krowne") contacted Wells Fargo and spoke with Wells Fargo employee Andrew Shannon. (ECF No. 221-1 at 124; ECF No. 221-4 at 306-07.) ***It is undisputed that this was the first time GSR contacted Wells Fargo about the Proposed Transaction***. (ECF No. 221-1 at 124; ECF No. 223-1 at 193.)[6] During this initial January 7th call, Shannon told GSR that other than confirming that (i) he knew who McDonald was, (ii) she was an escrow agent and (iii) she had an IOLTA account with Wells Fargo, Shannon "[could not] disclose

---

[5] On January 5 and January 6, there was no activity involving the 5641 Account, with the Account having an ending balance of approximately $20.00. (ECF No. 219-1 at 476-77.)

[6] At no point prior to this initial call did Wells Fargo have ***any knowledge*** about (i) the identity of GSR, (ii) the Proposed Transaction, or (iii) any details of the deal between the seller and buyer of the Bitcoin. (ECF No. 221-1 at 100-01, 124; ECF No. 221-2 at 17, 23; ECF No. 223-1 at 193-94, 215.)

more private information about [Wells Fargo's] customers." (ECF No. 220-1 at 134-36; ECF No. 221-1 at 148.)[7]

Following the initial January 7th call, Krowne sent Shannon an email dated January 7, 2019, 3:41 p.m., requesting only "***an inquiry***" into the IOLTA Account. (ECF 221-2 at 16-17; ECF No. 221-4 at 306-07; ECF No. 223-1 at 217-19.) In its first January 7th email, GSR ***did not*** mention that its concerns related to a "Bitcoin transaction," but instead referred cryptically to "the property-conveyance leg of the transaction," (ECF No. 221-4 at 306-07; ECF No. 223-1 at 219-20.) The January 7th email also ***did not*** make any demand for Wells Fargo to freeze the IOLTA Account, (ECF No. 221-2 at 17; ECF No. 221-4 at 306-07; ECF No. 223-1 at 221, 226).[8]

Shannon responded to GSR's initial January 7th email, acknowledging receipt and indicating that he would escalate the concern.

---

[7] At no point prior to or during the initial call did GSR provide Wells Fargo with any "proof" that GSR was not a "scammer" itself. (ECF No. 221-2 at 24-26.) Thus, from Shannon's perspective, GSR, Gil, and Krowne were all "strangers" inquiring about a customer's account. (ECF No. 223-1 at 215-26.)

[8] There is no evidence that GSR ever made a demand on Wells Fargo to freeze any of McDonald's other accounts, including the 5641 Account.

(ECF No. 221-2 at 4; ECF No. 221-4 at 306-07; ECF No. 223-1 at 223-224.)[9]

On January 7, 2019, at 5:17 p.m., Krowne sent another email to Shannon confirming that McDonald had now called and indicated that if the Bitcoins were not delivered by "close of business" on January 7th, then she would "commence the process of transferring" the Funds to GSR on January 8. (ECF No. 221-2 at 41-42; ECF No. 221-5 at 3; ECF No. 219-1 at 972.) In this email, Krowne indicated to Wells Fargo that GSR would therefore wait until January 8th to receive the Funds from McDonald. (ECF No. 219-1 at 972; ECF No. 221-2 at 41-44.) However, the purchased Bitcoin was not delivered to GSR by January 7th, as negotiated. (ECF No. 76 at 10, ¶ 27.) ***As of January 7, 2019, the IOLTA Account had an ending balance of $1,310,054.14 and the 5641 Account had an ending balance of $1,800,020.92***. (ECF No. 219-1 at 376-77, 476-77.)

---

[9] Shannon escalated the issue to the legal department for review in accordance with Wells Fargo policy and procedure and ***not*** because of any "apparent misappropriation." (ECF No. 219-1 at 180-82; ECF No. 220-1 at 137; ECF No. 223-1 at 222; ECF No. 223-2 at 71-72; ECF No. 237-3 at 35-36.) Shannon also had a call with McDonald, wherein McDonald stated that she would reach out to GSR immediately. (ECF No. 220-1 at 137-38.)

By *__January 8, 2019__*, it is undisputed that the Bitcoin had not been provided and McDonald had not wired the Funds back to GSR. (*See* ECF No. 76 at 10, ¶ 27.) Nevertheless, at no point on January 8th did GSR contact Wells Fargo to notify it that the Funds had not been received from McDonald or to make any demand for Wells Fargo to freeze the IOLTA Account. (ECF No. 220-1 at 162-63; ECF No. 221-2 at 73-74; ECF No. 223-1 at 226-29.) As of this time, Wells Fargo had no way of knowing the actual details of the Proposed Transactions, whether GSR and McDonald had reached some new agreement as to the Funds, or whether the parties had reached some other resolution of their issues. (ECF No. 220-1 at 151-52; ECF No. 237-3 at 33; ECF No. 224-1 at 156-58, 197-99). *On January 8, there was no activity involving the IOLTA Account, with the Account having an ending balance of approximately $1,310,054.14 and the 5641 Account had an ending balance of $1,000,020.92.* (ECF No. 219-1 at 376-77, 476-77.)[10]

---

[10] In its Brief, GSR states that despite receiving a call from GSR on January 7, 2019, Wells Fargo authorized an $800,000 wire transfer from "McDonald's IOLTA" on January 8, 2019. (Appellant's Br., Dkt. 19 at 21.) To clarify, this wire transfer was made out of the 5641 Account—not the IOLTA Account that is the subject of this dispute. (ECF No. 219-1 at 376-77, 476-77.) Nevertheless, based on the information available as of January 8th, Wells Fargo followed its customer's instructions in

On ***January 9, 2019***, after a call with Wells Fargo, GSR sent Wells Fargo an email stating in pertinent part as follows:

> Thus, we would like to request from Wells at this point (1) assurance that GSR's $4mm in funds deposited with Ms. McDonald have not been removed, and (2) for Wells to reach out to Ms. McDonald and impress upon her the seriousness of the situation.

(ECF No. 221-2 at 75-76; ECF No. 221-5 at 2.) By this point, Wells Fargo still had no way of knowing the full details of the Proposed Transaction. (ECF No. 223-1 at 226-27.) With respect to the first request contained in the January 9th email, Wells Fargo was not allowed as a matter of law and regulation to give any information to GSR with respect to the balance of McDonald's accounts, and with respect to the second request, Wells Fargo ***did*** reach out to McDonald. (*Id.* at 228-29.) Wells Fargo also forwarded the information to its legal department. (ECF No. 219-1 at 187-89.) ***As of January 9, 2019, GSR had made no demand on Wells Fargo that Wells Fargo freeze the IOLTA Account***. (ECF No. 221-2

---

completing the requested wire. (ECF 219-1 at 185-86; ECF No. 237-3 at 33-34.) Despite GSR's unfounded argument that none of its damages would have occurred had Wells Fargo frozen McDonald's IOLTA (or 5641) Account, even if Wells Fargo had frozen the IOLTA (or 5641) Account upon receipt of the January 9th email, ***GSR would not have been able to recover any more money than it has already recovered***. (*See* ECF No. 219-1 at 376-77, 476-77.)

at 79; ECF No. 221-5 at 2-5; ECF No. 223-1 at 229.) *On January 9, there was no activity involving the IOLTA Account or the 5641 Account, with the IOLTA Account having an ending balance of $1,310,054.14 and the 5641 Account having an ending balance of $1,000,020.92*. (ECF No. 219-1 at 376-77, 476-77).

On *__January 10, 2019__*, McDonald sent Shannon an email, stating in part:

> I understand that a gentleman by the name of Cristian Gil may have contacted you regarding my McDonald Law Group account with Wells Fargo. *Mr. Gil has no authority to contact you regarding that account. A business dispute has arisen between certain parties which they are in the process of resolving.* Any referenced by Mr. Gil to fraud etc (*sic*) is total unwarranted and he knows that. Apparently he believes he can throw around certain words and bully me into taking action that is not in the best interest of the parties involved. I have been a customer of Wells Fargo for over 30 years and I can assure you that nothing untoward has occurred in this matter.

> If Mr. Gil continues down this path, I will be forced to file an interpleader action and place any disputed funds in the court's registry.

(ECF No. 224-1 at 156-57, 197-99; ECF No. 223-1 at 232-34, 446 (emphasis added).)

On *__January 18, 2019__*, GSR received a wire from McDonald of $2,000,000. (ECF No. 221-2 at 124; ECF No. 221-5 at 50.) *As of January*

24

*18, 2019, the IOLTA Account had an ending balance of $110,054.14* *and the 5641 Account had an ending balance of $200,020.92*. (ECF No. 219-1 at 377, 477.)[11]

On ***February 4, 2019***, counsel for GSR sent a letter to Wells Fargo summarizing GSR's issues with the Proposed Transaction and requesting, ***for the first time***, that Wells Fargo freeze the IOLTA Account. (ECF No. 221-2 at 132-33; ECF No. 221-5 at 66-67.) On February 12, counsel for Wells Fargo, responded, stating that in making this "adverse claim," GSR failed to comply with O.C.G.A. § 7-1-353 and that "[d]ue to privacy restrictions, Wells Fargo cannot release any information concerning a customer's account absent a court order, a subpoena, or the customer's consent." (ECF No. 221-5 at 69.)[12] Despite

---

[11] On January 18, $800,000 was transferred from the 5641 Account to the IOLTA Account to allow for the $2,000,000 to be wired to GSR on January 18. (ECF No. 219-1 at 376-77, 476-77). Other than the $800,000 transfer on January 18, there was no further activity involving the IOLTA and 5641 Accounts, and the total balance remained unchanged. (ECF No. 219-1 at 376-77, 476-77.) Thereafter, there were no further transactions until a withdrawal request for the full amounts in the IOLTA and 5641 Accounts was made on March 13, 2019, in accordance with the District Court's Order (ECF No. 18; ECF No. 219-1, 376-87, 476-83).

[12] Before Wells Fargo could freeze the IOLTA Account, it required a court order. (ECF No. 219-1 at 110-11, 118-23; ECF No. 220-1 at 149-50.)

being in what GSR describes as a "state of red alert," and despite acknowledging and admitting that it could have obtained a court order to freeze the disputed Funds within a day or two of filing a lawsuit, GSR did not seek court intervention until March 1, 2019, approximately **two months** after the purchased Bitcoin was supposed to have been delivered. (ECF No. 1; ECF No. 221-1 at 140; ECF No. 221-2 at 94-95; ECF No. 226-1 at 244-45.)

### 4. GSR's Limited Due Diligence for the Proposed Transaction.

Prior to January 1, 2019, GSR had not transacted business with (1) Yavorsky or OTC Desks, (2) the Austins or Valkyrie, (3) Sumich or Alivic, or (4) McDonald. (ECF No. 221-1 at 46, 49, 51, 66, 69, 74-75; ECF No. 222-1 at 107-08, 117, 119-20.) GSR completed its due diligence on Yavorsky and OTC Desks and on-boarded OTC. (ECF No. 221-1 at 63-64, 69-73; ECF No. 222-1 at 67, 104; ECF No. 225-1 at 59.) GSR perhaps did

---

Wells Fargo's expert, Robert Pasley, confirms that "a bank cannot simply freeze an account based on an accusation from a noncustomer third party." (ECF No. 226-1 at 78-79, 242-44.) At no point prior to filing the Action did GSR ever submit or offer to submit a bond or other indemnity in connection with its "adverse claim" against Wells Fargo. (ECF No. 223-1 at 261.) At no point prior to filing the Action did GSR ever provide Wells Fargo with a copy of the Agreement. (ECF No. 221-2 at 22.)

"brief background checks" on the Austins and Valkyrie, but it ***did not*** complete any KYC checks on Valkyrie. (ECF No. 221-1 at 71, 73; ECF No. 222-1 at 101, 121-24, 173.) Next, GSR completed its due diligence on Sumich and Alivic and on-boarded them. (ECF No. 221-1 at 70-71, 80-82; ECF 221-4 at 178-79; ECF No. 222-1 at 97, 104-05.)

On January 2, 2019, Richard Rosenblum ("Rosenblum") (a consultant for GSR), had a call with McDonald and others to attempt to conduct "due diligence" on McDonald. (ECF No. 225-1 at 22-23, 76-78.) During this call, Yavorsky and/or Hugh Austin kept interrupting Rosenblum while he was trying to ask McDonald his "basic due diligence" questions. (*Id.* at 79.) Rosenblum admits this was "a bit suspicious." (*Id.* at 80-81.) Additionally, Rosenblum states that when he performed a Google search on McDonald and her two law firms, "so little" came up, which "drew some suspicion" given that McDonald was represented to GSR as having the "history of … a storied career as a lawyer." (*Id.* at 87.) Yet, this was still not enough for GSR's due diligence consultant to consider the results of the Google search to be a "red flag." (*Id.*). Ultimately, GSR ***did not*** complete a KYC check on McDonald or onboard McDonald. (ECF No. 222-1 at 101-03, 226.)

GSR did not make any other due diligence inquiry about McDonald's accounts at Wells Fargo and did not confirm with Wells Fargo that it had been involved in any other Bitcoin transaction with McDonald. (ECF No. 221-1 at 98, 117-18, ECF No. 221-4 at 179; ECF No. 222-1 at 185; ECF No. 225-1 at 94.) Instead, GSR admits it made a "judgment call" in initiating the GSR Wire.[13] (ECF No. 221-1 at 98-99.)

### 5.    Wells Fargo Addressed the Prior "Complaints" Regarding the IOLTA Account.

In an attempt to distract the Court from its nearly nonexistent due diligence review of the Proposed Transaction and the parties involved, GSR argues that Wells Fargo had notice that McDonald was using the IOLTA Account to perpetrate fraud because Wells Fargo customer Rena McDonald contacted Wells Fargo by telephone on January 25, 2018, after concerns arose that someone had potentially opened the IOLTA Account

---

[13] Wells Fargo's expert confirms that GSR's level of due diligence "should have been greatly enhanced." (ECF No 226-1 at 61-62, 250-53.) He also confirms that "prior to sending $4 million out the door, [GSR] failed miserably in [performing] any appropriate due diligence," including the appropriate due diligence on McDonald as escrow agent. (*Id.* at 45-46, 57, 250.) In fact, GSR's compliance officer confirmed that given the size of the Proposed Transaction, GSR would typically do "some additional checks to ensure that everything is as it's supposed to be, just to ensure that … the necessary protections are there." (ECF No. 222-1 at 32, 137-38; ECF No. 221-1 at 28.)

under her name. (Appellant's Br., Dkt.. 19 at 16.) Rena McDonald is an attorney in Nevada whose law firm also banked with Wells Fargo in 2018. (ECF No. 243-1 at 6-7, 9.) During Rena McDonald's call with Wells Fargo, she was advised that (i) the IOLTA Account was not associated with her or her law firm, (ii) she was not listed as an authorized user on the IOLTA Account, and (iii) the only Wells Fargo accounts associated with her or her law firm were ones she had opened. (*Id.* at 24-28, 33, 60-61, 102-04.) Rena McDonald ***did not*** request that Wells Fargo report any potential fraud. (*Id.* at 62-63, 102-04.) Afterwards, she never made any other phone calls to Wells Fargo or spoke with anyone about her "concerns." (*Id.* at 24, 31-33, 44, 50-53, 66.)[14]

GSR also points to an instance where a noncustomer, David Roth ("Roth"), contacted Wells Fargo by email on December 26, 2018, alleging that McDonald had not returned certain escrowed funds that he believed to be owed. (Appellant's Br., Dkt. 19 at 17-18; *see also* ECF No. 219-1 at

---

[14] Though GSR states that Wells Fargo did "nothing" following the January 25, 2018 call, (Appellant's Br., Dkt. 19 at 17), this is not true. The Wells Fargo representative escalated the call to her supervisor, who reviewed the call and determined that Rena McDonald was satisfied with the outcome given that her account was verified to be safe and secure. (ECF No. 219-1 at 143-45.)

174-75, 955-57.) Upon receipt, Shannon escalated the Roth email and contacted McDonald directly, who in turn said she would speak with Roth and handle the situation. (ECF No. 219-1 at 175-77; ECF No. 220-1 at 123-26; ECF No. 224-1 at 104-05.) Ultimately, Wells Fargo investigated the concern, confirmed the situation had been handled, and Roth was satisfied with the outcome. (ECF No. 219-1 at 175.)

**D.     Statement of the Standard or Scope of Review**

This Court reviews *de novo* the District Court's grant of Wells Fargo's Motion for Summary Judgment. *See Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005). The Court in *Ellis* explained, in pertinent part:

> Summary judgment is appropriate where the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. ***For factual issues to be considered genuine, they must have a real basis in the record. For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion***.

*Id.* at 1325-26 (emphasis added) (citations omitted).

30

## IV.  SUMMARY OF THE ARGUMENT

The District Court properly granted summary judgment in Wells Fargo's favor on all of GSR's claims. GSR appeals the District Court's ruling as it relates to GSR's negligence claim and its derivative claims for attorneys' fees and punitive damages. (Appellant's Br., Dkt. 19 at 13.) This Court should affirm for the following reasons.

_First_, the District Court properly granted summary judgment in favor of Wells Fargo on GSR's negligence claim based on its holding that Wells Fargo owes no duty of care to GSR because GSR is not a customer of Wells Fargo and does not otherwise have a direct relationship with Wells Fargo. (ECF No. 250 at 43-46.) On appeal, GSR relies on the Eleventh Circuit's interpretation of Florida law purporting to expand a bank's duty of care to a noncustomer which is owed a duty of care by the bank customer. (Appellant's Br., Dkt. 19 at 28.) As the District Court properly noted, Florida law does not apply here. (ECF No. 250 at 46.) GSR also relies on an unrelated and irrelevant Georgia Supreme Court case that imposed a duty of care to third parties when carrying out a voluntary undertaking. (Appellant's Br., Dkt. 19 at 29-32.) Though this was not presented to the District Court, the case is distinguishable on its

facts and is not sufficient to upend the well-established principle that a bank owes no duty of care to a noncustomer.

*Second*, the District Court properly granted summary judgment in favor of Wells Fargo on GSR's derivative claim for attorneys' fees and punitive damages because all of GSR's substantive claims fail. (ECF No. 250 at 54-55.)

*Third*, all of GSR's claims, including its negligence claim, are preempted by the UCC because Article 4 governs the rights and liabilities associated with any claim arising out of the disputed wire transfers in and out of the IOLTA Account. Despite GSR's conclusory statement that Wells Fargo knew or should have known by at least January 7, 2019, that McDonald was using the IOLTA Account for fraudulent purposes, none of the supposed "red flags" relied upon by GSR are legally sufficient to create a genuine issue of material fact as to Wells Fargo's alleged knowledge of any potential fraudulent activity. Accordingly, the District Court erred in its holding that Article 4A did not preempt GSR's claims. (*See* ECF No. 250 at 30-38.)

*Fourth*, Wells Fargo is statutorily immune from liability arising out of McDonald's misuse of funds in her capacity as a fiduciary for GSR

because after considering the facts and events relating to the Proposed Transaction, Wells Fargo had no knowledge that McDonald was acting dishonestly in her role as a fiduciary. Because Georgia law presumes that a fiduciary will appropriately discharge her duty and will not misappropriate funds under her control, Wells Fargo is statutorily immune from liability arising out of McDonald's subsequent misuse of these funds in accordance with O.C.G.A. § 7-1-352. Accordingly, the District Court erred in its holding that O.C.G.A. § 7-1-352 did not shield Wells Fargo from liability. (*See* ECF No. 250 at 38-41.)

*Fifth*, Wells Fargo is statutorily immune from liability based on its response to the adverse claim GSR made on the IOLTA Account on February 4, 2019, because despite having made an adverse claim under O.C.G.A. § 7-1-353(a), GSR failed to provide Wells Fargo with a court order or other effective legal process, an agreement of the parties concerning the adverse claim, or a bond or other indemnity to protect Wells Fargo from loss as a consequence of recognizing the adverse claim. (ECF No. 221-1 at 140; ECF No. 221-2 at 94-95; ECF No. 223-1 at 261; ECF No. 226-1 at 244-45.) As such, GSR indisputably failed to meet the requirements of O.C.G.A. § 7-1-353(b). Accordingly, the District Court

erred in holding that Wells Fargo was not shielded from liability for claims arising out of its response to GSR's adverse claim. (*See* ECF No. 250 at 41-43.)

# V.    ARGUMENT

**A.    The District Court Properly Granted Summary Judgment on GSR's Negligence Claim Because Wells Fargo Does Not Owe a Duty of Care to GSR.**

GSR appears to acknowledge the basic and accepted principle that banks do not owe a duty of care to noncustomers to support a negligence claim brought against the bank by a noncustomer. (Appellant's Br., Dkt. 19 at 28.) It is undisputed here that GSR was not a customer of Wells Fargo and never entered into a written agreement or other relationship with Wells Fargo. (ECF No. 221-1 at 123-24; ECF No. 221-2 at 5, 23-24, 84-85.) As such, Wells Fargo owes no legal duty to GSR. This basic principle of law has been repeatedly confirmed by numerous courts.[15]

---

[15] *See, e.g.*, *Zeal Global Servs., Private Ltd. v. SunTrust Bank*, 508 F. Supp. 3d 1303, 1316-17 (N.D. Ga. 2020); *Kalpakchian v. Bank of Am. Corp.*, No. 1:18-cv-03235, 2019 WL 12426033, at *5 (N.D. Ga. Oct. 4, 2019), *aff'd,* 832 F. App'x 579 (11th Cir. 2020); *Midwest Feeders, Inc. v. Regions Bank (Inc.) (Ala.)*, No. 1:15-CV-00013, 2016 WL 5796894, at *6 (M.D. Ga. Sept. 30, 2016), *aff'd,* 707 F. App'x 952 (11th Cir. 2018); *Parrish v. Chase Bankcard Servs., Inc.*, No. 1:13-cv-01504, 2014 WL 12572735, at *5 (N.D. Ga. June 10, 2014), *R. & R. adopted,* 2014 WL 12575839 (N.D. Ga. July 17, 2014); *Promissor, Inc. v. Branch Bank & Tr. Co.*, No. 1:08-cv-1704, 2008 WL 5549451, at *5 (N.D. Ga. Oct. 31, 2008); *Houston v. Bedgood*, 588 S.E.2d 437, 440 (Ga. Ct. App. 2003); *First Union Bank of Ga. v. Daniel*, 368 S.E.2d 768, 770 (Ga. Ct. App. 1988); *Big Bend Agri-Servs., Inc. v. Bank of Meigs*, 330 S.E.2d 422, 425 (1985).

However, GSR argues on appeal that there is an exception to this general rule when (i) the noncustomer has a fiduciary relationship with the customer, (ii) the bank knows or ought to know of the fiduciary relationship, and (iii) the bank has actual knowledge of its customer's misappropriations. (Appellant's Br., Dkt. 19 at 28-32.) In support of this argument, GSR relies primarily on Florida law and the Eleventh Circuit's interpretation of Florida law, and on the Second Circuit's interpretation of New York law. (*Id.* at 28.) However, consistent with the District Court's holding, because neither Florida nor New York law applies to this case, any "exception" to the general rule potentially available under Florida or New York law is inapplicable to this case. (*See* ECF No. 250 at 46.)[16]

---

[16] The District Court's holding is consistent with how other District Courts in this Circuit have ruled when presented with similar arguments. *See e.g.*, *Chen Jun v. Regions Bank*, No. 1:19-cv-01524, 2020 WL 5603527, at *10 (N.D. Ala. Sept. 18, 2020) (declining to impose a duty on a bank for the benefit of noncustomers on the basis of the Eleventh Circuit's ruling in *Chang* because Florida law does not apply to the case governed by Alabama law); *Parm v. Nat'l Bank of Cal., N.A.*, 242 F. Supp. 3d 1321, 1341 n.6 (N.D. Ga. 2017) (distinguishing the plaintiff's reliance on *Chang* because it interpreted Florida law); *Sullivan's Admin. Managers II, LLC v. Guarantee Ins. Co.*, No. CV 412-212, 2014 WL 12617453, at *7 (S.D. Ga. Jan. 31, 2014) (even though the applicable statutes under Georgia and Florida law are "nearly identical," the statutes "exist under different bodies of jurisprudence," and therefore "Florida law is inapposite to interpreting [Georgia law]").

36

Nevertheless, GSR argues that courts in Georgia have applied the "fiduciary exception" to hold banks liable for their customers' misappropriation of funds in trust accounts. (Appellant's Br., Dkt. 19 at 28-32.) However, GSR conflates the lack of any legal duty owed to noncustomers (which is undisputed) with the existence of exceptions to statutory immunity provided to banks arising out of a fiduciary's management of funds (which is specifically addressed by O.C.G.A. § 7-1-352).

For example, GSR relies on *First American Title Insurance Co. v. Eddings*, No. 4:12-cv-10, 2014 WL 106691 (M.D. Ga. Jan. 9, 2014), for the proposition that a bank may be liable for its customer's misappropriation of trust account funds if there is evidence that the bank has actual knowledge that the customer was acting dishonestly or intended to commit a breach. (Appellant's Br., Dkt. 19 at 29.) However, the Court's analysis in *Eddings* does not create a new legal duty that a bank owes to a noncustomer or otherwise impose some level of strict or automatic liability for the actions of a customer. *See Eddings*, 2014 WL 106691, at *3. Instead, the Court's analysis is precisely the same analysis undertaken to determine whether a bank is entitled to immunity under

37

O.C.G.A. § 7-1-352. *See id.* The other cases cited by GSR are similar in their analysis and equally provide no source for a legal duty supporting a noncustomer's claim for alleged negligence against a third-party bank for the actions of its customer.[17]

Indeed, all of the cases cited by GSR are either distinguishable on their facts or support the conclusion that a bank (under O.C.G.A. § 7-1-352) cannot be liable for the fiduciary's misappropriation. First, unlike the trust account in *Eddings* having a negative balance ***fifty times***, since January 1, 2016, the IOLTA (and 5641) Account ***never*** had a negative balance. (*See* ECF No. 219-1 at 303-487); *see Eddings*, 2014 WL 106691, at *4. Additionally, unlike the fiduciary customer in *Eddings* who presented fraudulent wire transfer confirmations to cover up certain

---

[17] *See Nat'l Nu Grape Co. v. Citizens & S. Nat'l Bank*, 93 S.E.2d 381, 387 (Ga. Ct. App. 1956) (referencing the former Georgia Code § 13-2042, which is now reflected in O.C.G.A. § 7-1-352 and relying on former Georgia Code § 108-423); *Citizens Bank of Forsyth v. Middlebrooks*, 72 S.E.2d 298, 300 (Ga. 1952) (referencing the former Georgia Code § 13-2042, now reflected in O.C.G.A. § 7-1-352); *Tattnall Bank v. Harvey*, 198 S.E. 724, 725-26 (Ga. 1938) (same); *Dalton Point, L.P. v. Regions Bank, Inc.*, 651 S.E.2d 549, 552 (Ga. Ct. App. 2007) (referencing language on whether statutory immunity under O.C.G.A. § 7-1-352 applies (citing *Atlanta Sand & Supply Co. v. Citizens Bank*, 622 S.E.2d 484, 487-88 (Ga. Ct. App. 2005)).

payment failures, there is nothing here to suggest that McDonald falsified any documents. *See Eddings*, 2014 WL 106691, at \*4. Next, despite the fiduciary depositing trust funds into his personal bank account, the *Middlebrooks* court, which relied on the ruling by the *Tattnall* Bank court, concluded:

> [T]he mere fact that a fiduciary deposits in a bank to his individual account a check drawn by him in his fiduciary capacity, or transfers funds by a check from an account in the bank in his name as a fiduciary to his personal account in the bank, will not of itself charge the bank with knowledge or notice that he is misappropriating or will misappropriate such funds.

*Middlebrooks*, 72 S.E.2d at 300 (quoting *Tattnall Bank*, 198 S.E. at 726). Finally, despite a company's bookkeeper using company funds to pay off a personal debt owed to the bank, the *Dalton Point* court concluded that such actions were insufficient to charge the bank with knowledge of the misappropriation of company funds, even though the bank was benefiting from the loan payments. *Dalton Point*, 651 S.E.2d at 552. These cited cases do not support GSR's claims against Wells Fargo.

GSR next argues that the Georgia Supreme Court's recent opinion in a premises liability case, *Georgia CVS Pharmacy, LLC v. Carmichael*, 890 S.E.2d 209 (Ga. 2023), is supportive of GSR's position here.

39

(Appellant's Br., Dkt. 19 at 32-33.) Specifically, GSR argues that this Court should conclude that if a bank "voluntarily undertakes" to open a trust account for a customer, then whatever duties of loyalty are owed by the customer to third parties are then imputed onto the bank. (*Id.*) This is not the law.

GSR's reliance on *Carmichael* is completely misplaced. *Carmichael* is a premises liability case, wherein the court concluded that if a party renders security services to a property owner, knowing that the services are needed due to reasonably foreseeable criminal activity on the property, the party rendering the security service may owe a duty of care to third parties who later visit the property and are victims of said criminal activity, if there is some failure to exercise reasonable care in providing the security services. 890 S.E.2d at 232. The Restatement (Second) of Torts relied upon by the *Carmichael* case is wholly inapplicable to the facts here involving commercial banking transactions. *See In re Equifax Fair Credit Reporting Act Litig.*, No. 1:22-cv-03072, 2023 WL 6192732, at *7 (N.D. Ga. Sept. 11, 2023) (explaining that the duty of care detailed in *Carmichael* is based on the "proprietor-invitee relationship" and not applicable to create a new common law duty

40

plaintiff seeks to impose on credit reporting agencies). The *Carmichael* case does not support GSR's claims against Wells Fargo.

The District Court properly held that Wells Fargo owed no duty to GSR, and properly granted summary judgment as to all claims. (ECF No. 250 at 43-46.)

## B. The District Court Properly Granted Wells Fargo Summary Judgment on GSR's Derivative Claims for Punitive Damages and Attorneys' Fees.

By granting summary judgment on each of GSR's substantive claims, the District Court also properly granted summary judgment on GSR's derivative claims for punitive damages and attorneys' fees. (ECF No. 250 at 54.) On appeal, though GSR appeals the outcome of the ruling, GSR does not appear to be appealing the Court's reasoning and does not provide any basis as to why these derivative claims would be able to proceed where all of the substantive claims fail as a matter of law. (Appellant's Br., Dkt. 19 at 35-36.) As such, this Court should affirm the District Court's ruling on this issue.

## C. The District Court erred because GSR's Claims are Preempted by the Article 4A of the UCC.

GSR's claims against Wells Fargo arise out of the funds transferred out of the IOLTA Account after GSR sent the Wire on January 3, 2019.

(*See e.g.*, ECF No. 221-1 at 111.) Because a party's rights and liabilities for such claims are covered by Article 4A of the UCC, GSR's claims against Wells Fargo, which seek to impose liability inconsistent with the rights and liabilities expressly created by Article 4A, are therefore preempted. *See e.g.*, *Zeal*, 508 F. Supp. 3d at 1316-17.[18] The District Court ultimately held that Article 4A does not preempt GSR's claims based on GSR's argument that Wells Fargo "knew or should have known that the [F]unds were fraudulently obtained and disposed of," and, therefore, declined to grant summary judgment on this basis. (ECF No. 250 at 30-38.)

In reaching its holding, the District Court considered the three "red flags" identified by GSR relating to McDonald to allegedly show that Wells Fargo knew or should have known that the wires were fraudulent. (*Id.* at 34-38.) In its holding, the District Court properly disposed of GSR's first two "red flags" relating to McDonald's account history with Wells Fargo and the prior "complaints" it received regarding the IOLTA

---

[18] *See also Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1361 (11th Cir. 2020); *Peter E. Shapiro, P.A. v. Wells Fargo Bank, N.A.*, 795 F. App'x 741, 750 (11th Cir. 2019); *Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1274 (11th Cir. 2003); *First Ga. Bank v. Webster*, 308 S.E.2d 579, 580-81 (Ga. Ct. App. 1983).

Account. (ECF No. 250 at 35 (citing *Zeal*, 508 F. Supp. 3d at 1313 and *Regions Bank,* 345 F.3d at 1277-78)). GSR's brief does not challenge these findings.

When considering GSR's third "red flag," the District Court concluded that, as of January 7, 2019, GSR had notified Wells Fargo of its concerns that the Proposed Transaction had not been completed and that McDonald had not yet returned the Funds. (ECF No. 250 at 36-73.) However, a detailed review of the undisputed timeline—and what GSR conveniently leaves out—shows that on that ***same day***, GSR sent Wells Fargo notice that McDonald had indicated to GSR that she would "commence the process of transferring" the Funds to GSR on January 8, 2019, if the purchased Bitcoins were not delivered to GSR by "close of business" on January 7th, and confirmed to Wells Fargo that GSR would wait until January 8th for the return of the Funds. (ECF No. 221-2 at 41-42; ECF No. 221-5 at 3; ECF No. 219-1 at 972.)

Thus, from Wells Fargo's perspective, as of the end of the day on January 7th, GSR and McDonald had obviously reached some agreement amongst themselves as to the Funds. (ECF No. 220-1 at 151-152; ECF No. 237-3 at 33; ECF No. 224-1 at 156-158, 197-199). And even though

GSR argues that Wells Fargo knew that as of January 7th that there were insufficient funds in the IOLTA Account to be able to transfer the Funds back to GSR on January 8th, this does not impute any knowledge of wrongdoing because Wells Fargo would have no way of knowing, as of January 7th, whether the Bitcoin would be delivered at some point that day or whether McDonald would have sufficient funds in the IOLTA Account the following day to "commence the process" of transferring the Funds back to GSR. Moreover, at no point on January 8th did GSR contact Wells Fargo to notify it that the Funds had not been wired to GSR as originally indicated by McDonald or to make any demand for Wells Fargo to freeze the IOLTA Account. ECF No. 220-1 at 162-163; ECF No. 221-2 at 73-74; ECF No. 223-1 at 226-29.) GSR has never pointed to any evidence to indicate otherwise.

Ultimately, it was not until ***January 9, 2019***, that GSR notified Wells Fargo that the Funds had not been transferred to GSR by January 8th. (ECF No. 221-5 at 2.) This was indisputably the ***first time*** GSR stated to Wells Fargo that its Funds had not been returned by January 8th as indicated by McDonald. (*See id.*) And though GSR ***did not*** make a request on January 9th that the IOLTA (or 5641) Account be frozen, all

44

of the disputed wires out of the IOLTA (or 5641) Account had been completed by that date. (ECF No. 221-2 at 79; ECF No. 221-5 at 2-5; ECF No. 223-1 at 229; ECF No. 219-1 at 376-77, 476-77.)

Thus, even assuming that the information GSR provided on January 9, 2019, was somehow viewed as sufficient to put Wells Fargo on notice of the potential fraud (which it was not), such notice would have been ***after*** the disputed wires were already completed. *See Zeal*, 508 F. Supp. 3d at 1313 (bank was not alerted to the potential fraud ***before*** the disputed wires); *Provident Bank*, 345 F.3d at 1277 (first statement received by the bank suggesting that the wires were potentially fraudulent was received ***after*** the payment orders were made).

Additionally, though the District Court noted in its opinion that Shannon "escalated" the issue in response to GSR reaching out to Wells Fargo on January 7, 2019, and that Shannon expressed some "concern" regarding McDonald's accounts, (ECF No. 250 at 37), this unspecified "concern" is not legally sufficient to charge Wells Fargo with knowledge of the fraudulent activity at issue here, and the District Court erred in determining that Shannon's "concern" raised an issue of fact sufficient to

45

create an exception to GSR's claims being preempted by the UCC.[19] *See*

*Regions Bank v. Kaplan*, No. 17-15478, 2021 WL 4852268, at \*16 (11th

Cir. Oct. 19, 2021) (the "evidence" plaintiff relied on to demonstrate that

the defendant knew or should have known that certain funds were

fraudulently obtained "at most" gave the defendant "reason to be

suspicious about account activity" which "is not the same as knowledge

of the underlying fraud"). There is simply no evidence in this case to

support a claim that Wells Fargo had any reason to know of the specific

fraud that occurred here prior to it already having occurred.

**D.    The District Court erred in holding that Wells Fargo is not Statutorily Immune from Liability for the Alleged Misuse of Funds by McDonald.**

In Georgia, "every person is presumed to have the intention of

discharging whatever duty" and that they will not misappropriate the

funds committed to their care. *See e.g. Tattnall Bank*, 98 S.E. at 725.

_____

[19] Any "concerns" Shannon may have had arising out of McDonald's account balance and the transfer of funds despite McDonald having indicated to GSR that she would "commence the process" of transferring the Funds to GSR on January 8, was based on information that would have been discovered during Wells Fargo's "escalation," which would have taken place after Wells Fargo's receipt of the first January 7 email and after January 9 when GSR indicated to Wells Fargo that the Funds had not been returned by January 8. (*See* ECF No. 220-1 at 146.)

Consistent with this common law presumption, O.C.G.A. § 7-1-352 protects a bank "from liability where an agent or fiduciary misappropriates funds of the owner in breach of his agency or trust without the bank's knowledge," even if the lack of knowledge was a result of negligence. *Focus Ent. Int'l, Inc. v. Wachovia Bank, N.A.*, No. 1:04-cv-2649, 2005 WL 8155037, at *7 (N.D. Ga. Nov. 18, 2005) (citation omitted).[20]

The facts in this case highlight the very purpose of the legislature's purpose in enacting O.C.G.A. § 7-1-352 [21]—McDonald was presumed to have the intention of discharging the duty she had to GSR, and Wells Fargo was authorized to pay the amounts drawn on the IOLTA (and 5641) Account and, therefore, is shielded from liability arising out of McDonald's alleged wrongdoing. Although McDonald ultimately misused

---

[20] *See also Atlanta Sand*, 622 S.E.2d at 488; *Bank South v. Grand Lodge of Free & Accepted Masons for Ga.*, 331 S.E.2d 629, 632-33 (Ga. Ct. App. 1985).

[21] Indeed, this ensures that "in view of the multitudinous transactions in the ordinary daily course of banking, such institutions are not … hampered and the conduct of their business, in which the public has a vital interest, clogged and slackened by unreasonable restrictions and overburdens." *Tattnall Bank*, 198 S.E. at 726. A bank is not required to scrutinize every transaction by a fiduciary. *Serv. Lines, Inc. v. Tr. Co. Bank*, 377 S.E.2d 872, 874 (Ga. Ct. App. 1989).

47

the Funds between January 3, 2019, and January 7, 2019, these transfers were all indisputably completed without Wells Fargo's knowledge of McDonald's alleged wrongdoing for the reasons outlined above.

In its holding, the District Court considered the three "red flags" addressed above but erred in concluding that these "red flags," when considered together, raised a genuine dispute as to whether Wells Fargo had knowledge that McDonald acted dishonestly. (ECF No. 250 at 40-41.)

First, the referenced "account history" was not sufficient to put Wells Fargo on notice that McDonald was mismanaging the Funds sufficient to defeat the shield of liability provided under O.C.G.A. § 7-1-352. *See Tr. Co. Bank of Augusta N.A. v. Henderson*, 364 S.E.2d 289, 291 (Ga. Ct. App. 1987) (a bank is protected under O.C.G.A. § 7-1-352 even when a fiduciary unlawfully enriches himself by writing checks on the account made payable to himself), *aff'd,* 373 S.E.2d 738 (Ga. 1988).[22]

---

[22] *See also Grogan v. Lanier Bank & Tr. Co.*, 464 S.E.2d 892, 893-94 (Ga. Ct. App. 1995) (affirming summary judgment under O.C.G.A. § 7-1-352 because the fiduciary's use of funds to secure a personal loan was not sufficient to put the bank on notice that the fiduciary was mishandling the funds); *Eddings*, 2014 WL 106691, at *4 (a pattern of negative balances in a trust account is not necessarily enough to put a bank on notice that its customer is misappropriating trust funds).

48

Further, the prior "complaints" had nothing to do with circumstances relating to the Proposed Transaction or McDonald's management of the Funds, and therefore, for reasons similar to above, they are also insufficient to put Wells Fargo on notice that McDonald was mismanaging those Funds. *See Zeal*, 508 F. Supp. 3d at 1313; *Provident Bank,* 345 F.3d at 1277. The same is true for any mere "concerns" Shannon may have had regarding McDonald's credibility. *See Kaplan*, 2021 WL 4852268, at *16.

Ultimately, the burden of imputing knowledge of a fiduciary's misuse of funds onto a bank is a high burden and one that cannot be established in this case. GSR voluntarily made the decision to wire the Funds to McDonald based upon the representation of individuals GSR had never previously worked with and without even having a written agreement with McDonald regarding the nature and management of the Funds. Based on the undisputed timeline of events, there can be no presumption that Wells Fargo had any level of knowledge to suggest that McDonald was acting dishonestly. Notwithstanding whether McDonald violated her duty to GSR, Wells Fargo is statutorily immune from liability for any such violation. *See Atlanta Sand*, 622 S.E.2d at 487-88

(affirming summary judgment because the fiduciary possessed broad authority to endorse deposits to and withdraw money); *Focus Ent.*, 2005 WL 8155037, at *7 (bank was never notified of the business transaction, so the circumstances of the improper transfers would not support the sole inference that the fiduciary was breaching a duty and would not excite attention).

The District Court erred in not granting summary judgment to Wells Fargo on all claims pursuant to O.C.G.A. § 7-1-352. (ECF No. 250 at 38-41.)

## E.    The District Court erred in holding that Wells Fargo is not Statutorily Immune from Liability for its Response to the Adverse Claim Asserted by GSR.

Georgia law provides that upon receipt of an "adverse claim" to account funds, ***"a bank … shall not be required to deny control over or access to a deposit account … to (1) [t]he customer in whose name the account … is held by the bank … or (2) [a] person … who is authorized to draw on or control the account."*** O.C.G.A. § 7-1-353(a) (emphasis added). There are limited circumstances under which a bank can deviate from this obligation. O.C.G.A. § 7-1-353(b). Specifically, a bank "shall be entitled to act and rely upon: (1) [a] court order … or

other effective legal process; (2) [a]n agreement of the parties concerning an adverse claim; or (3) [an adverse claim] accompanied by a bond or other indemnity adequate to protect the bank … from loss as a consequence of recognizing an adverse claim." *Id.*

Here, by letter dated February 4, 2019, counsel for GSR made an "adverse claim" to the Funds in the IOLTA Account and requested that Wells Fargo place a freeze on the IOLTA Account. (ECF No. 221-2 at 132-33; ECF No. 221-5 at 66-67.) This was indisputably the first time GSR made a demand that Wells Fargo take action to freeze the IOLTA Account. (*See* ECF No. 221-2 at 79, 93-94.) Wells Fargo responded on February 12, 2019, specifically stating, among other things, that in making this "adverse claim," GSR failed to comply with O.C.G.A. § 7-1-353 and that "[d]ue to privacy restrictions, Wells Fargo cannot release any information concerning a customer's account absent a court order, a subpoena, or the customer's consent." (ECF No. 221-2 at 136-37; ECF No. 221-5 at 68-69.)

At no point prior to the initiating this Action did GSR present Wells Fargo with a "court order … or other effective legal process" regarding the IOLTA Account. (ECF No. 223-1 at 258-59.) Additionally, at no point

51

did GSR present Wells Fargo with an "agreement" between GSR and McDonald relating to GSR's adverse claim. (ECF No. 221-1 at 120-21.) Finally, at no point did GSR submit or offer to submit a bond or other indemnity in connection with its "adverse claim." (ECF No. 223-1 at 261.) These facts are not disputed.

Consequently, although Wells Fargo received an adverse claim, because McDonald is the "customer in whose name" the IOLTA Account was held and the "person … who is authorized to draw on" the IOLTA Account," unless GSR was able to satisfy the requirements in O.C.G.A. § 7-1-353(b), Wells Fargo "[would] not be required to deny control over or access to a deposit account" to McDonald or her firm. (ECF No. 223-1 at 257-58, 453.) The District Court properly concluded (and GSR does not challenge) that GSR failed to comply with the requirements in O.C.G.A. § 7-1-353(b). (ECF No. 250 at 42-43; ECF No. 221-2 at 136-37; ECF No. 221-5 at 68-69.)

However, the District Court nevertheless concluded that O.C.G.A. § 7-1-353(a) allows a bank to act if the requirements in subsection (b) are satisfied, but does not require the bank to act. (ECF No. 250 at 42-43.) The District Court's view was that "the statute gives banks rights vis-à-

52

vis their account holders without imposing any right on third parties or requirement on the bank to act in a certain way because of an adverse claim." (*Id.* at 43.) The District Court concluded that "[Wells Fargo] was not authorized to deny McDonald control over the funds" in her Accounts, but still held that this conclusion did not provide protection against GSR's claims that Wells Fargo should have denied her control over such funds. (*Id.*)

It surely defeats the purpose of the statute itself if GSR is permitted to make an "adverse claim" on the IOLTA Account, and when prompted by Wells Fargo to meet the requirements of O.C.G.A. § 7-1-353(b), refuses to meet such requirement only to then later assert claims against Wells Fargo arising out of Wells Fargo's failure to deny McDonald control over the IOLTA Account.[23] *See Dean v. Nationsbank*, 486 S.E.2d 647, 648 (Ga. Ct. App. 1997) (bank immune from liability after an adverse claim is made on a customer account). The statute at issue should not be

---

[23] To the extent the District Court declined to grant summary judgment on all of GSR's claims based on GSR's argument that Wells Fargo "negligently fail[ed] to [affect a freeze]," such a ruling would be contrary to the purpose of O.C.G.A. § 7-1-353, especially, when Wells Fargo owes no duty of care to GSR as a noncustomer.

interpreted in a manner that allows a third party asserting an adverse claim to fail to comply with the statutory requirements yet at the same time assert that the bank should deny the customer access to or control over their funds.

The District Court erred by holding that Wells Fargo was not protected by O.C.G.A. § 7-1-353, and should have granted summary judgment in favor of Wells Fargo on all claims on this basis. (ECF No. 250 at 41-43.)

## VI.    <u>CONCLUSION</u>

The District Court properly granted summary judgment in Wells Fargo's favor on all of GSR's claims, including GSR's negligence claim and its derivative claims for attorneys' fees and punitive damages. This Court should affirm the grant of summary judgment in favor of Wells Fargo for all of the reasons outlined herein.

*s/ Brent D. Hitson*
Brent D. Hitson
Georgia Bar No. 358025
bhitson@burr.com
Tala Amirfazli
Georgia Bar No. 523890
tamirfazli@burr.com
*Counsel for Appellee Wells Fargo*
*Bank, N.A.*

54

**BURR & FORMAN LLP**
171 Seventeenth Street, N.W.
Suite 1100
Atlanta, Georgia 30363
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in 14-point Century Schoolbook, which is a proportionally spaced font that includes serifs.

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,435 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Eleventh Circuit Rule 32-4.

*s/ Brent D. Hitson*
Brent D. Hitson
Georgia Bar No. 358025
bhitson@burr.com
Tala Amirfazli
Georgia Bar No. 523890
tamirfazli@burr.com

*Counsel for Appellee Wells Fargo Bank, N.A.*

Dated: October 11, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on the <u>11th</u> day of October, 2023 a copy of the foregoing document has been electronically filed with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all participants who are registered CM/ECF users and by sending a copy of the foregoing document via U.S. Mail, postage prepaid, to the following counsel of record:

Richard L. Robbins
Vincent R. Russo
Rachel F. Gage
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
*Counsel for Appellant GSR Markets Limited*

*s/ Brent D. Hitson*
Brent D. Hitson
Georgia Bar No. 358025
bhitson@burr.com
Tala Amirfazli
Georgia Bar No. 523890
tamirfazli@burr.com

*Counsel for Appellee Wells Fargo Bank, N.A.*

57